La Juez Asociada Señora Rodríguez Rodríguez
emitió la opinión del Tribunal.
Este caso nos brinda la oportunidad de expresarnos en torno a los criterios a utilizar para delimitar la zona marítimo-terrestre. En particular, nos corresponde evaluar si, al realizar el deslinde de la referida zona, el Departamento de Recursos Naturales y Ambientales (DRNA) puede recurrir al criterio de hasta donde llegan las mayo-res olas en los temporales aunque el área objeto del deslinde califique como sensible a las mareas. Asimismo, tenemos la oportunidad de considerar si las características topográficas y geográficas del espacio a deslindar constitu *422 yen un criterio que debe considerar el DRNA al delimitar esta zona.
El DRNA sostiene que en la tarea de realizar el deslinde de la zona marítimo-terrestre se deben utilizar, en conjunto, el criterio de “hasta donde baña el mar los terrenos en su flujo y reflujo” y el de “hasta donde llegan las mayo-res olas en los temporales”, que se recogen en la Ley de Muelles y Puertos de Puerto Rico de 1968, Ley Núm. 151 de 28n de junio de 1968 (23 L.P.R.A. see. 2101 et seq.), junto a factores bióticos y abióticos presentes en la zona de estudio. A su juicio, la conjunción de estos factores determina el límite interior de la zona marítimo-terrestre. En apoyo a dicha contención, el DRNA cita el Manual de Procedimientos para el Deslinde del Límite Interior Tierra Adentro de los Bienes de Dominio Público Marítimo-Terrestre adoptado por dicha agencia como guía para los procedimientos de deslinde de la zona.
Por el contrario, el peticionario, señor Blás Buono Correa, rechaza el argumento del DRNA y nos plantea que en aquellos lugares costeros donde las mareas son sensibles —como alega ocurre en sus terrenos— la zona marítimo terrestre es aquella parte de la costa que baña el mar en su flujo y reflujo; es decir, hasta donde llega la marea más alta, sin más.
I
El peticionario es el propietario de tres fincas en el barrio Aguirre, Sector Punta Arenas, en Salinas, Puerto Rico. El 18 de febrero de 2003, éste solicitó del DRNA un deslinde de la zona marítimo-terrestre, ya que interesaba construir una casa de recreo en una de las fincas y necesitaba obtener los permisos correspondientes para lo que se requería ese deslinde.
Dos años más tarde, el 13 de diciembre de 2005, el Ledo. Javier J. Rúa, Subsecretario del DRNA, le envió una carta *423 en la que le comunicó que las fincas objeto de la petición de deslinde se encontraban completamente ubicadas dentro de la zona marítimo-terrestre. No obstante, aclaró que dichas propiedades no podían considerarse de dominio público, ya que habían sido adquiridas con anterioridad a la vigencia de la Ley de Aguas de 1866. El DRNA reconoció que su delimitación de la zona marítimo-terrestre era sin perjuicio de los derechos adquiridos por el peticionario, según reconocidos por la legislación decimonónica.
Así las cosas, el 10 de enero de 2006, el peticionario presentó un recurso de revisión ante el DRNA, al amparo del Artículo 15 (15.5) del Reglamento para el Aprovechamiento, Vigilancia, Conservación y Administración de las Aguas Territoriales, los Terrenos Sumergidos bajo éstas y la Zona Marítimo Terrestre, Reglamento Núm. 4860 de 30 de diciembre de 1992, Departamento de Recursos Naturales (Reglamento 4860). Mediante dicho recurso, éste alegó, entre otras cosas, que era improcedente la delimitación de la zona marítimo-terrestre mediante Mapa Preliminar, pues tal mecanismo era inaplicable al caso, procediendo en su lugar un deslinde físico de los terrenos. El 10 de julio de 2006, el Secretario del DRNA, Hon. Javier Vélez Arocho, decretó el cierre de la solicitud del peticionario y emitió una orden para que la División de Agrimensura del DRNA procediera a realizar el deslinde solicitado en el término de treinta días.
El DRNA no realizó el deslinde, por lo que el peticionario presentó ante el Tribunal de Primera Instancia una petición de mandamus. Solicitó del tribunal que le ordenara al Secretario cumplir con su deber ministerial de realizar el deslinde de la zona marítimo-terrestre.
El 14 de noviembre de 2006 se celebró una vista con antelación a la vista en su fondo. Como resultado de ello, el tribunal dictó una sentencia por “transacción en corte abierta” mediante la cual ordenó —habiéndose ello estipulado por las partesque el Secretario del DRNA habría de *424 concluir el deslinde de la zona marítimo-terrestre en un término de cuarenta días. Sin embargo, el Secretario no realizó el deslinde en el término estipulado, por lo que Buono Correa presentó una solicitud para que se le encontrara incurso en desacato civil. El Secretario se opuso a la solicitud y alegó que la zona marítimo-terrestre se extendía tierra adentro más allá de los terrenos del peticionario, motivo por el cual tanto los colindantes como el municipio debían ser notificados del plano de deslinde para que tuvieran la oportunidad de impugnarlo de ser necesario.
El 28 de febrero de 2007, el foro de instancia celebró una vista de desacato en la cual le ordenó al Secretario realizar el deslinde en un término de noventa días. Sin embargo, la agencia estableció que debido a la extensión y complejidad del trabajo no era posible cumplir con la encomienda en el término dispuesto por el tribunal. En virtud de ello, solicitó un plazo adicional de nueve meses para completar el deslinde. El foro de instancia denegó este término y fijó un plazo final de treinta días, so pena de desacato.
Luego de varios trámites procesales, se celebró una vista de desacato. Las partes presentaron sus respectivas teorías sobre el alcance de la delimitación tierra adentro de la zona marítimo-terrestre. El tribunal recibió tanto evidencia testifical como documental a esos efectos. Luego de la vista las partes presentaron sendos memorandos de derecho en el cual delinearon sus respectivas posiciones.
El 20 de septiembre de 2007, el Tribunal de Primera Instancia emitió una resolución en la que determinó, en lo que nos concierne, lo siguiente:
[S]e ordena al Secretario del DRNA, a culminar el deslinde de la zona marítimo terrestre en los terrenos del demandante conforme el criterio del lugar, hasta donde el mar baña los terrenos en su flujo y reflujo, con total abstracción del criterio de las mayores olas en los temporales, y conforme al estudio de marea preparado por el agrimensor, Emilio López Rivera y aceptado como correcto por los funcionarios del DRNA. En este caso en particular donde las mareas son sensibles, no aplica lo relativo al caso donde las mareas no son sensibles por *425 ende no hay que entrar en consideraciones de a dónde llegan las mayores olas en tiempo de temporal.
Además, el foro de instancia determinó que era correcta la posición del peticionario a los efectos de que los manglares no se consideran parte de la zona marítimo-terrestre sólo por el hecho de ser manglares. Dicho foro concluyó, invocando como fundamento nuestro dictamen en Rubert Armstrong v. E.L.A., 97 D.P.R. 588 (1969), que la existencia de manglares en las fincas del peticionario no demostraba, necesariamente, que éstas se encuentran en la zona marítimo-terrestre.
El Secretario del DRNA presentó un recurso de certiorari ante el Tribunal de Apelaciones. En su petición adujo que para delimitar la zona marítimo-terrestre en los terrenos del peticionario se tiene que utilizar el criterio de “has-ta donde las olas del mar bañan los terrenos en su flujo y reflujo”, junto al criterio de “hasta donde llegan las mayo-res olas en los temporales”, además de la presencia de factores bióticos y abióticos —como manglares y vegetación salitrosa— que puedan estar ubicados en los terrenos bajo estudio. Sostuvo que su posición respecto a qué constituye la zona marítimo-terrestre responde a su conocimiento y pericia sobre esta materia.
El peticionario se opuso a la petición de certiorari. Además, solicitó la desestimación del recurso bajo el fundamento de que en éste se expresó que el DRNA comparecía ante el Tribunal de Apelaciones y no el Secretario del DRNA, quien figuró como parte demandada ante el Tribunal de Primera Instancia.
El Tribunal de Apelaciones validó la posición del DRNA de que en la delimitación de la zona marítimo-terrestre en los terrenos del peticionario procede utilizar los criterios de “flujo y reflujo del mar” y de las “mayores olas en los temporales” de la Ley de Muelles y Puertos de Puerto Rico de 1968 en conjunto con los factores abióticos y bióticos presentes en dichos terrenos. El tribunal intermedio le confi *426 rió total deferencia a la determinación del DRNA considerando que el legislador delegó en éste la prerrogativa de poner en vigor la política pública sobre la conservación de los recursos naturales. Ante la pericia de la agencia, razonó dicho foro que era improcedente la intervención judicial. Por último, el Tribunal de Apelaciones dispuso de la solicitud de desestimación presentada por el señor Buono Correa. Sostuvo que el recurso no debía desestimarse sin la previa oportunidad de enmendar la comparecencia para incluir en ésta al Secretario del DRNA.(1)
Inconforme, el peticionario recurrió ante este Tribunal mediante recurso de apelación. En síntesis, expone que erró el Tribunal de Apelaciones al otorgarle deferencia al DRNA en su posición sobre los criterios que deben regir el deslinde de la zona marítimo-terrestre. El 27 de junio de 2008 acogimos el recurso como un certiorari y expedimos el auto solicitado. Ambas partes han comparecido, por lo que pasamos a resolver.
II
A. El deslinde administrativo de la zona marítimoterrestre es, sin duda, una función de vital importancia para el Estado pues establece los límites del dominio público marítimo con respecto a las propiedades colindantes. Aun cuando el deslinde implique una declaración sobre la naturaleza física del terreno como zona marítimo-terrestre, lo cierto es que “en ningún caso tiene carácter declara *427 tivo de derechos”. C. Horgué Baena, El deslinde de costas, Madrid, Ed. Tecnos, 1995, pág. 215. Ésta es una operación jurídica y técnica que tiene como resultado materializar sobre el terreno las definiciones legales. En este tenor, la profesora Horgué Baena, op. cit., pág. 228, lo describe “como un acto que se circunscribe a constatar una realidad física lo que presupone una labor de interpretación jurídica de conceptos y de las definiciones legales de los mismos y, además, una labor técnica de comprobación sobre el terreno de tales características”.
Toda vez que el acto de deslindar consiste en la aplicación práctica de preceptos legales, el deslinde de la zona marítimo terrestre requiere que se determine el alcance de esta zona según se define en nuestra legislación y reglamentación. Ahora bien, cualquier discusión sobre este tema nos lleva a un entronque con el Derecho Histórico, ya que nuestra normativa sobre el litoral costero se remonta a la Ley de Aguas española de 1866. Colección Legislativa de España, Madrid, 1866, T. XCVI, Segunda Parte, págs. 294-346. Esta legislación especial se hizo extensiva a Puerto Rico mediante la Real Orden de 8 de agosto de 1866. Rubert Armstrong v. E.L.A., supra, pág. 618. Véase, además, San Gerónimo Caribe Project v. E.L.A. I, 174 D.P.R. 518 (2008). Dicha ley dio paso a la adopción de piezas legislativas posteriores que, a su vez, sirvieron de base para “configurar la legislación y reglamentos vigentes en las agencias administrativas de Puerto Rico” relativas a la delimitación de la zona marítimo-terrestre. A. Lugo (editor), Cartilla de la Zona Marítimo-Terrestre, Mayagüez, Sea Grant, Universidad de Puerto Rico, 2004, Vol. 18, Núms. (1-3), pág. 23.
B. La Ley de Aguas de 1866 constituyó un esfuerzo para sistematizar las normas jurídicas anteriores relativas a las aguas terrestres y marítimas, con el interés de “fija[r] los derechos y obligaciones del Estado y de los particulares, prescindiendo de todo lo que pu [diese] considerarse como *428 Reglamentario y propio del Poder ejecutivo”. F. Pan Montojo (editor), Revista de los Tribunales y de Legislación Universal, Legislación de Aguas, 9na ed., Madrid, Ed. Góngora, 1952, pág. 16. Véase S. Martín-Retortillo, La Elaboración de la Ley de Aguas de 1866, 32 Rev. Adm. Púb. 11-54 (1960).
La Ley de Aguas de 1866, en su Título I, proclamaba que eran de dominio nacional y uso público: las costas o fronteras marítimas, el mar litoral, y las playas. La playa se define en esta ley como
... el espacio que alternativamente cubren y descubren las aguas en el movimiento de la marea. Forma su límite interior o terrestre la línea hasta donde llegan las más altas mareas y equinocciales. Donde no fueren sensibles las mareas, empieza la playa por la parte de tierra en la línea adonde llegan las aguas en las tormentas ó temporales ordinarios. Artículo 1(3°) de la Ley de Aguas de 1866, supra, pág. 295.
En la Exposición de Motivos de la citada ley se expresó que al declarar las playas como bienes de dominio público se persiguió el objetivo de “ ‘restablecer la disposición de nuestras antiguas Leyes que de acuerdo con las romanas, les fijaban por límite aquel d[ó]nde alcanzan las olas del mar en sus temporales ordinarios, espacio bastante para las necesidades de navegación y pesca Rubert Armstrong v. E.L.A., supra, pág. 620. Véase F. Pan Montojo, op. cit., pág. 20. En ese tenor, autores de la época sostenían que la definición de “la playa” era equivalente a lo que se había entendido en Las Partidas como “ribera del mar” o la orilla del mar por los romanos. M. Colmeiro, Derecho administrativo español, 4ta ed., Madrid, 1876, T. II, pág. 7, citado en Horgué Baena, op. cit., pág. 30, esc. 9. Este criterio lo sostienen en la actualidad varios autores modernos. Véanse: L. Martínez Escudero, Playas y Costas: su régimen jurídico administrativo, 2da ed. rev., Madrid, Ed. Montecorvo, S.A., 1985, pág. 38; L. Pérez Conejo, Lecciones de Dominio Público, Universidad de Málaga, 2007, págs. 119-120 (“las playas de 1866 eran lo que los romanos *429 llamaban ‘orillas del mar’ y en la época medieval se denominaban ‘riberas del mar’, y que se referían a toda la franja litoral y no como se le conoce en la actualidad”).
Ahora bien, la doctrina no es unánime en cuanto a este parecer. La profesora Horgué Baena, op. cit., pág. 31, sostiene que la definición introdujo un criterio alternativo “que no estaba ni en los textos romanos ni en las Partidas pues ... en éstos se atendía a las mayores crecidas del mar sin diferenciar el fenómeno —mareas o temporales— que pudiera producirla”. Afirma que con la definición de playa de la Ley de Aguas de 1866 “se opera una restricción, al menos conceptual, del terreno que pudiera considerarse playa, al negarse la posibilidad [de] que mayores olas por temporales rebasaran las líneas ideales marcadas por las mareas, en donde éstas fuesen relevantes”.(2) íd. Igual criterio expresa la profesora Desdentado Daroca (“la concepción plasmada en la Ley de 1866 es más restrictiva que la recogida anteriormente en Las Partidas ...”). E. Desdentado Daroca, La expropiación de los enclaves privados en el litoral, Navarra, Ed. Thomson Civitas, 2007, pág. 25.
La definición de playa, objeto de la referida discusión doctrinal, se mantuvo vigente en el ordenamiento español hasta que el Título I de la Ley de Aguas de 1866 se desgajó de ese estatuto y se convirtió, con algunas modificaciones, en la Ley de Puertos de 7 de mayo de 1880.(3) Colección Legislativa de España, Madrid, Imprenta del Ministerio de Gracia y Justicia, T. CXXIV, Segunda Parte, 1881, págs. *430 787-800. Véanse: Martínez Escudero, op. cit., pág. 41; Pérez Conejo, op. cit., págs. 119-120. Aunque la Ley de Puertos de 1880 siguió los lineamientos generales de la Ley de Aguas de 1866, introdujo varias modificaciones relevantes.(4) Entre ellas, identificó por primera vez el concepto zona marítimo terrestre en sustitución del término playa de la Ley de Aguas de 1866. Pérez Conejo, op. cit., págs. 119-120. Véase Horgué Baena, op. cit., pág. 35.
A pesar de este cambio en los términos, la doctrina sostiene que conceptualmente la definición de la zona marítimo-terrestre prescrita en la Ley de Puertos de 1880 mantuvo los criterios que imperaban bajo la definición de playa de la Ley de Aguas de 1866. Horgué Baena, op. cit., pág. 35. Véanse, además: Martínez Escudero, op. cit., pág. 42; Rivero Ysem, Las afecciones y desafecciones naturales de la zona marítimo-terrestre en el Derecho español, en Estudios en Homenaje a López Rodó, Madrid, [s. Ed.], 1972, Vol. II, pág. 348.
La zona marítimo-terrestre quedó configurada en la Ley de Puertos de 1880 como “el espacio de las costas o fronteras marítimas del territorio español que baña el mar en su flujo y reflujo, en donde son sensibles las mareas, y las mayores olas en los temporales, en donde no lo sean. Esta zona marítimo-terrestre se extiende también por las márgenes de los ríos hasta el sitio en que sean navegables o se hagan sensibles las mareas”. Art. 1 de la Ley de Puertos de 1880, supra, págs. 787-788. Dicha zona quedó declarada del dominio nacional y uso público, “sin perjuicio de los derechos que correspondan a los particulares ...”. Id., pág. 787. Véanse: San Gerónimo Caribe Project v. E.L.A. I, supra; Horgué Baena, op. cit., págs. 34-35.
Puede observarse que textualmente la definición de la *431 zona marítimo-terrestre de la Ley de Puertos de 1880 refleja la existencia de dos criterios para determinar su ex-tensión: uno de ellos para los lugares donde sean sensibles las mareas y el otro donde no lo sean. En el primero de los casos, la zona se delimitaría en función del flujo y reflujo de la marea; en el segundo, a base de hasta dónde lleguen las mayores olas en los temporales. Tal distinción, sin embargo, no goza de la simplicidad que aparenta si consideramos que al ser el concepto zona marítimo-terrestre equivalente al de playa de la Ley de Puertos de 1866, su alcance es objeto de igual discusión en la doctrina.(5)
Tras esbozar, a grandes rasgos, las distintas posiciones de la doctrina española sobre el alcance del término playa bajo la Ley de Aguas de 1866 y la zona marítimo-terrestre bajo la Ley de Puertos de 1880, examinaremos el trato particular que estas leyes proveían para los espacios terrestres inundables por las aguas del mar. Asimismo, reseñaremos algunos aspectos relevantes sobre el desarrollo más reciente en la legislación española sobre costas que resultan ilustrativos en cuanto al alcance de la legislación decimonónica que le precedió.
C. Antes de examinar las disposiciones de la Ley de Aguas de 1866 y la Ley de Puertos de 1880 relativas a los terrenos inundables por las aguas marinas, cabe referirnos a nuestras expresiones en Rubert Armstrong v. E.L.A., supra. En dicho caso se inició un pleito sobre reivindicación contra el Estado Libre Asociado, siendo el objeto de la controversia unos terrenos que incluían áreas cubiertas por marismas y manglares. Resolvimos que los bienes objeto de reivindicación, independientemente de que estuviesen *432 comprendidos o no en una zona marítimo-terrestre, eran bienes de dominio particular pues se adquirieron como tales mucho antes de la Ley de Puertos de 1880 e, incluso, antes de la Ley de Aguas de 1866.
Señalamos, entonces, que aunque asumiéramos que los terrenos eran “ ‘sensible [s] a las mareas y que con el cam-bio de éstas se extravasaran en ell[os] las aguas del mar, o sea, que la Parcela [objeto de la controversia] era una marisma’ ”, las disposiciones de la Ley de Puertos de 1880 reconocían la titularidad privada sobre “este tipo de zona ‘marítimo-terrestre’ ”. (Énfasis en el original.) Rubert Armstrong v. E.L.A., supra, pág. 624.
De otra parte, citando a El Pueblo v. Dimas et al., 18 D.P.R. 1061, 1072 (1912), afirmamos que en el ordenamiento español los manglares recibían un trato particular pues se consideraban como montes del Estado “aunque contituy[er]an terrenos inundados”.(6) Rubert Armstrong v. E.L.A., supra, pág. 629. Véase Scaevola, op. cit., pág. 143. Señalamos que los manglares estaban comprendidos bajo la definición de montes establecida por Real Decreto de 21 de abril de 1876, el cual proveía para el deslinde y la conservación de los montes de la Corona existentes en Cuba Y Puerto Rico. Rubert Armstrong v. E.L.A., supra, págs. 629-630. Véase Colección Legislativa de España, Madrid, T. CXVI, 1876, págs. 359-361. Mediante dicho decreto se definieron los montes como “todos los terrenos destinados particularmente a la producción de maderas y leñas y las tierras de pastos no cultivadas”, y se distinguía entre los “montes públicos” y “montes de particulares”. Colección Legislativa de España, op. cit, T. CXVI, pág. 360. Se conside *433 raban montes de particulares los que con justo título pertenecieran al dominio privado. Id.
Por el trato que la legislación especial española otorgaba a estos bienes, rechazamos la tesis de que “los man-glares, o marismas de la zona marítimo-terrestre [fuesen], por s[ó]lo esa condición de manglares, bienes de dominio y uso público de los de aquella naturaleza que están fuera del alcance del comercio de los hombres ...”. (Énfasis suprimido.) Rubert Armstrong v. E.L.A., supra, pág. 630, citando a El Pueblo v. Dimas et al., supra. Esta expresión sugiere que si bien los manglares y las marismas podían ser parte de la zona marítimo-terrestre, ello no implica que fuesen bienes del dominio público.
Así, en San Gerónimo Caribe Project v. E.L.A. I, supra, citamos Rubert Armstrong v. E.L.A., con el propósito de ilustrar la existencia de enclaves privados en la zona marítimo-terrestre. Indicamos que en Rubert Armstrong v. E.L.A., supra, reconocimos la posibilidad de que los man-glares y las marismas de la zona marítimo-terrestre constituyeran “propiedad y título particular”, ello como consecuencia de las leyes especiales antes discutidas. San Gerónimo Caribe Project v. E.L.A. I, supra, citando a Rubert Armstrong v. E.L.A., supra, pág. 630. Es decir, no descartamos que los manglares y marismas pudiesen estar comprendidos como parte de la zona marítimo terrestre, sino que reconocimos que éstos podrían constituir enclaves privados comprendidos en esta zona como resultado de la legislación especial decimonónica.
Específicamente, la Ley de Aguas de 1866 y la Ley de Puertos de 1880 disponían que “[e]n las charcas, lagunas ó estanques de agua del mar, formados en propiedad particular, no susceptibles de comunicación permanente con aquel por medio de embarcaciones, solamente podr[ía]n pescar sus dueños sin más restricciones que las relativas a la salubridad pública”. Art. 15 de la Ley de Aguas de 1866, *434 supra, pág. 297; Art. 11 de la Ley de Puertos de 1880, supra, pág. 790. Véase Desdentado Daroca, op. cit., pág. 28.
Además, la Ley de Aguas de 1866 prescribía que el gobierno español podía “conceder para su desecación las marismas propias del Estado ó de uso comunal de los pueblos” cuando ello no resultara perjudicial para “la navegación de los ríos ó conservación de los puertos”. Artículo 26 de la Ley de Aguas de 1866, supra, pág. 299. Asimismo, se permitía la desecación de las marismas de propiedad particular tras la autorización del Estado y si ello no redundaba en perjuicio de los intereses antes indicados. Id. Véase Horgué Baena, op. cit., pág. 33; Rubert Armstrong v. E.L.A., supra.
Posteriormente, la Ley de Puertos de 1880 estableció un mecanismo de concesiones de las marismas pertenecientes al Estado “ó del domino público” para que fuesen “desecadas, cultivadas o aprovechadas de otra manera ...”. Arts. 51 y 55 de la Ley de Puertos de 1880, supra, págs. 797-798. Además, se dispuso que para la desecación y saneamiento de las marismas declaradas terrenos insalubres se seguirían las disposiciones de la Ley de Aguas de 1866 respecto a “los terrenos pantanosos”.(7) íd. Se permitía, en síntesis, la desecación de las marismas, fuesen éstas bienes de propiedad particular o pertenecientes al Estado, si ello no incidía sobre los intereses de navegación y pesca, y luego de haber obtenido el permiso correspondiente del gobierno. Id. Véanse, además: Horgué Baena, op. cit., pág. 37; Martínez Escudero, op. cit., pág. 152; Desdentado, op. cit., pág. 28.
La profesora Horgué Baena, op. cit., pág. 37, indica que aunque tanto la Ley de Aguas de 1866 como la Ley de Puertos de 1880 hacían referencia a las marismas, ninguna de ellas disponía qué debía entenderse comprendido *435 bajo dicho concepto. No es hasta la Ley de 24 de julio de 1918 (conocida como Ley Cambó) sobre desecación y saneamiento que la marisma se definió en el ordenamiento español “como aquel terreno inundado por las aguas del mar que permaneciese encharcado o que produjese emanaciones insalubres”. Id., citando el Artículo 1 de la Ley Cambó.
Conforme con esto, el profesor Pérez Conejo, op. cit, págs. 123-124, comenta que las marismas eran consideradas espacios improductivos, focos de enfermedades infecciosas y, en general, perjudiciales a la salud pública. Como consecuencia de dicha percepción se estimulaba su desaparición “mediante su desecación y saneamiento por los particulares, otorgándoles una concesión a perpetuidad o lo que es lo mismo la propiedad sobre los terrenos desecados”. Id. Véase Horgué Baena, op. cit, pág. 37 esc. 26.
Avances posteriores en el campo científico propiciaron el abandono de esa concepción pues se identificaron las marismas como espacios necesarios para el desarrollo y la supervivencia de especies bióticas de valor ecológico. Pérez Conejo, op. cit, pág. 124. Dicho cambio discursivo se reflejó, a su vez, en el trato recibido por las marismas en la esfera legal. Id.
En el ordenamiento español constituyó un paso en esa dirección el Reglamento para la Ejecución de la Ley de Costas de 26 de Abril de 1969 (Ley 28/1969), aprobado por Real Decreto 1088/1980, de 23 de mayo de 1980. Aunque dicha ley no incluía disposiciones específicas sobre las marismas, el Reglamento de 1980 declaró expresamente que éstas se encontraban incluidas en el dominio público. Horgué Baena, op. cit, pág. 43. Ello le otorgó nuevo vigor a una controversia doctrinal que había precedido la adopción del Reglamento, referente a si las marismas “podían ser encuadradas en la definición de zona marítimo terrestre como una parte de la misma”, aunque ello sin perjuicio de los derechos adquiridos por particulares. Horgué Baena, op. cit, pág. 43 esc. 38.
*436 La controversia antes indicada se disipó, al menos en el ordenamiento español, al adoptarse la Ley de Costas de 28 de julio de 1988 (Ley 22/1988).(8) Específicamente, el Artículo 3 de esa ley dispuso que se considerarían incluidos en la zona marítimo-terrestre “las marismas, albuferas, marjales, esteros, y en general los terrenos bajos que se inundan como consecuencia del flujo y reflujo de las mareas, de las olas o de la filtración del agua del mar”. Véase Horgué Baena, op. cit, pág. 58.
Al comentar este cambio, la profesora Horgué Baena, op. cit., pág. 60, indica que “[difícilmente puede admitirse que en la definición de zona marítimo terrestre dada en la Ley de 1969 quedasen comprendidas todas estas realidades Sugiere que a lo sumo podían considerarse como parte de la zona marítimo-terrestre las marismas, según disponía el Reglamento de 1980. Id. Es decir, la inclusión de dichos espacios en la zona marítimo terrestre constituyó una expansión de la definición provista en la Ley de Costas de 1969 que mantenía, a su vez, la definición decimonónica de la zona marítimo-terrestre al conceptuarla como el espacio litoral “que baña el mar en su flujo y reflujo, en donde sean sensibles las mareas, y las mayores olas en los temporales ordinarios, en donde no lo sea”. Art. 1 de la Ley de Costas de 1969, supra. Véase Horgué Baena, op. cit, pág. 41.
Sobre la inclusión de terrenos inundados por las aguas del mar como parte de la zona marítimo-terrestre, citamos in extenso la siguiente distinción elaborada por el profesor Pérez Conejo, op. cit., pág. 123:
Hemos de diferenciar la zona marítimo-terrestre en sentido genuino o auténtico de la zona marítimo-terrestre por extensión. La diferencia estriba en la permanencia o no del *437 agua en su contacto con la tierra. Así, la zona marítimoterrestre en sentido auténtico comprende la zona del mar que fluye y refluye, no quedándose estancada en la tierra (zona terrestre-marítima). Por su parte, se considera zona marítimoterrestre por extensión a la superficie'comprendida por las marismas, las albuferas, los marjales, los esteros, y los terrenos bajos inundables de vez en cuando. Se trata, en definitiva, de terrenos bajos que son inundados periódicamente por las aguas del mar o del viento marino y en los que el agua permanece estancada (zona marítima-terrestre).
Así, pues, la legislación española incluyó como parte de la zona marítimo-terrestre ciertos terrenos inundados periódicamente por las aguas del mar aunque éstos no se encuentren expuestos de forma continua al flujo y reflujo de las mareas. Este no constituye el único ámbito expansivo de la legislación española pues, además, se incorporaron las playas como bienes de dominio público.
Las leyes españolas sobre costas de 1969 y 1988 incluyeron las playas como una clase adicional de bien de dominio público. Dicho concepto, no obstante, se reintegra con una acepción claramente distinta a la que se le atribuía en la Ley de Aguas de 1866. La Ley de Costas de 1969 definió las playas como “las riberas de mar o de las rías formadas por arenales o pedregales en superficie casi plana, con vegetación nula o escasa y característica”. Art. 1 de la Ley de Costas de 1969, supra.
Sostiene Horgué Baena, op. cit., pág. 42, que dicha definición “contemplaba una clase diferenciada de bien demanial, en la medida en que sólo se tenían en cuenta las características del terreno ... sin vincularlo a la acción de oleaje”. Bien podría ocurrir que los espacios que corresponden a la playa coincidan en ciertas áreas con los espacios comprendidos bajo la definición de zona marítimo-terrestre, aunque la playa podría exceder la extensión de terreno configurado como zona marítimo-terrestre o viceversa. íd. Véase Martínez Escudero, op. cit., págs. 47-48.
D. A diferencia de España, donde se han suscitado cambios significativos en la legislación sobre costas, en *438 Puerto Rico continuaron vigentes las disposiciones de la Ley de Puertos de 1880 tras el cambio de soberanía hasta la aprobación de la Ley de Muelles y Puertos de Puerto Rico de 1968, Ley Núm. 151 de 28 de junio de 1968, según enmendada, 23 L.P.R.A. sec. 2101 et seq. Véanse: San Gerónimo Caribe Project v. E.L.A., supra; Director I.C.P. v. Fitzgerald, etc., 130 D.P.R. 46 (1992). Surge de la Exposición de Motivos de la Ley de Muelles y Puertos de 1968 que ésta se adoptó con el objetivo de reglamentar la navegación y el tráfico marítimo de las aguas navegables de Puerto Rico, sus puertos y muelles, y con el objetivo de conferir a la Autoridad de los Puertos el control y la administración de estas aguas “para beneficio del Pueblo de Puerto Rico en interés de la navegación y el comercio 1968 Leyes de Puerto Rico 481.
Esta ley no alteró la definición de zona marítimoterrestre proveniente de la legislación decimonónica, y esta zona quedó descrita por el legislador como
... el espacio de las costas de Puerto Rico que baña el mar en su flujo y reflujo, en donde son sensibles las mareas, y las mayores olas en los temporales en donde las mareas no son sensibles, e incluye los terrenos ganados al mar y las márgenes de los ríos hasta el sitio en que sean navegables o se hagan sensibles las mareas; y el término, sin condicionar, significa la zona marítim[o] terrestre de Puerto Rico. Art. 1, Sec. 1.03 de la Ley de Muelles y Puertos de 1968, supra, 23 L.P.R.A. sec. 2103(h).
La citada definición se incorporó en iguales términos en el Reglamento para el Aprovechamiento, Vigilancia, Conservación y Administración de las Aguas Territoriales, los Terrenos Sumergidos bajo éstas y la Zona Marítimo-Terrestre, Reglamento Núm. 4860 del DRNA de 30 de diciembre de 1992 (Reglamento 4860), el cual rige el deslinde de esta zona.(9) Aunque el Reglamento 4860 adoptó textual *439 mente la definición de zona marítimo-terrestre provista en la Ley de Muelles y Puertos de Puerto Rico de 1968, el trasfondo legal bajo el cual se promulgó esta pieza reglamentaria no se limita a esta ley ni a la legislación española previamente discutida.
Antes bien, al promulgarse el Reglamento 4860, el DRNA tuvo ante sí un amplio desarrollo legislativo en el área ambiental, cuya consideración resulta fundamental para la controversia que nos ocupa. Dicha legislación está cimentada en la política pública ambiental establecida en la Constitución de Puerto Rico sobre la más eficaz conservación de nuestros recursos naturales. Veamos.
III
Ante la necesidad imperante de la conservación de nuestro entorno ambiental, la Constitución de Puerto Rico estableció como política pública “la más eficaz conservación de sus recursos naturales, así como el mayor desarrollo y aprovechamiento de los mismos para el beneficio general de la comunidad ...”. Art. VI, Sec. 19, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1999, pág. 421. Véanse: Misión Ind. P.R. v. J.P. y A.A.A., 142 D.P.R. 656, 676 (1997); Paoli Méndez v. Rodríguez, 138 D.P.R. 449, 460 (1995). En repetidas ocasiones hemos afirmado que la citada disposición constitucional no constituye sólo “la expresión de un insigne afán”, ni se reduce “a un mero postulado de principios”. Misión Ind. P.R. v. J.C.A., 145 D.P.R. 908, 919-920 (1998); Paoli Méndez v. Rodríguez, supra, pág. 460, citando a J. Trías Monge, Historia Constitucional de Puerto Rico, San Juan, Ed. U.P.R., 1982, Vol. III, pág. 235. “Se trata, más bien, de un mandato que [obliga a todos los componentes del Estado] y que prevalece sobre cualquier estatuto, reglamento u ordenanza que sea contraria a éste.” (Énfasis en el original.) Misión Ind. P.R. v. J.C.A., supra, pág. 919. Más aún, hemos afirmado que la política pública ambiental es *440 tablecida en la Constitución de Puerto Rico “fija de modo incuestionable el criterio jurídico primordial para juzgar la validez o interpretar el significado de cualquier norma o decisión relativa al uso o protección de los recursos naturales formulada por la Asamblea Legislativa o por cualquier agencia, departamento, municipio o instrumentalidad gubernamental”. Misión Ind. P.R. v. J.C.A, supra, págs. 919-920.
A casi dos décadas de haberse establecido el referido mandato, éste fue reafirmado por la Asamblea Legislativa al adoptar la Ley sobre Política Pública Ambiental, Ley Núm. 9 de 18 de junio de 1970 (Ley Núm. 9),(10) 12 L.P.R.A. sec. 1121 et seq. (ed. 2003). Municipio de Loíza v. Sucns. Suárez et al., 154 D.P.R. 333, 348 (2001). Véanse, además: Misión Ind. P.R. v. J.C.A., supra, pág. 920; Paoli Méndez v. Rodríguez, supra, pág. 462. Como una respuesta al problema del marcado deterioro ambiental y los riesgos que éste ya representaba para la salud y el bienestar general de la comunidad, la Asamblea Legislativa afirmó “la importancia crítica de restaurar y mantener la calidad medio ambiental al total bienestar y desarrollo del [ser humano] ...”. Art. 3(a) de la Ley Núm. 9 (12 L.P.R.A. sec. 1123(a) (ed. 2003)). A través de la Ley Núm. 9 se sostuvo como política pública el utilizar todos los mecanismos disponibles para promover las condiciones que permitiesen la coexistencia armónica entre el ser humano y su medio ambiente. Id. Como medio para cumplir con la política pública trazada se afirmó, entre otras medidas, la responsabilidad del Estado de “preservar los importantes aspectos históricos, culturales y naturales de nuestro patrimonio” y “asegurar para todos los puertorriqueños paisajes seguros, saludables, productivos y estéticos y culturalmente placenteros ...”. 12 L.P.R.A. sec. 1123(b)(4) y (2).
*441 Además, la Ley Núm. 9 exigió que los departamentos, las agencias, las corporaciones públicas, los municipios y las instrumentalidades del Estado interpretaran, implementaran y administraran todas las leyes y los cuerpos reglamentarios del país “en estricta conformidad” con la política pública antes enunciada. Art. 4 de la Ley Núm. 9 (12 L.P.R.A. see. 1124 (ed. 2003)). Véanse, además: Misión Ind. P.R. v. J.C.A., supra, pág. 921; Mun. de Loíza v. Sucns. et al., supra, pág. 348.
Otro estatuto mediante el cual el Estado, a través de la Asamblea Legislativa, “ha reiterado su compromiso con la más eficaz conservación de los recursos naturales” es, precisamente, la Ley Orgánica del Departamento de Recursos Naturales y Ambientales, Ley Núm. 23 de 20 de junio de 1972 (3 L.P.R.A. sec. 151 et seq.). Paoli Méndez v. Rodríguez, supra, págs. 462-463. Dicha ley le impuso al DRNA la responsabilidad de implementar “en lo que respecta a la fase operacional” la política pública ambiental contenida en la Constitución de Puerto Rico. Art. 3 de la Ley Núm. 23, supra, 3 L.P.R.A. sec. 153. Por su parte, al Secretario del DRNA se le confirió la facultad de aprobar aquella reglamentación necesaria para llevar a cabo los objetivos de la ley. Art. 5(d) de la Ley Núm. 23, supra, 3 L.P.R.A. sec. 155(d).
La ley orgánica del DRNA delegó a dicha agencia la facultad y el deber de “[e]jercer la vigilancia y conservación de las aguas territoriales, los terrenos sumergidos bajo ellas y la zona marítimo-terrestre ...”. Artículo 5(h) de la Ley Núm. 23 (3 L.P.R.A. sec. 155(h)). Además, mediante el Artículo 6 de la Ley Núm. 23, supra, 3 L.P.R.A. sec. 156, se transfirieron al DRNA ciertas facultades que previamente correspondían al Departamento de Transportación y Obras Públicas (DTOP) mediante la Ley Núm. 6 de 29 de febrero de 1968. La citada Ley Núm. 6 estableció el Área de Prevención de Inundaciones y de Conservación de Playas y Ríos como una división del DTOP. 12 L.P.R.A. see. 255. Esta Área de Prevención ejercía, entre otras, las siguientes *442 funciones: el estudio y control de las inundaciones; la vigilancia, conservación, limpieza y control de erosión de las playas; el deslinde y saneamiento de la zona marítimoterrestre, y la vigilancia y atención de los manglares pertenecientes al Estado. See. 2 de la Ley Núm. 6, supra, 12 L.P.R.A. sec. 255a.
Entendemos que el legislador, al transferir al DRNA dichas facultades, reflejó su preocupación de que estas funciones se ejercieran en armonía con las exigencias de conservación y preservación que esta agencia viene obligada a implementar. Estimamos, pues, que tal actuación legislativa no constituyó un mero ejercicio accidental sino el reconocimiento patente de la necesidad de llevar a cabo el deslinde de esta zona en estricta conformidad con la política pública ambiental que el DRNA está obligado a implantar.
Luego de haber adoptado la Ley Núm. 23, la Asamblea Legislativa aprobó la Ley de Vigilantes de Recursos Naturales y Ambientales del Departamento de Recursos Naturales y Ambientales (Ley de Vigilantes de Recursos Naturales y Ambientales), Ley Núm. 1 de 29 de junio de 1977 (12 L.P.R.A. see. 1201 et seq.). Esta medida legislativa, nuevamente, enfatizó la política pública sobre “la más eficaz preservación y conservación de los recursos naturales de Puerto Rico, patrimonio y riqueza de nuestro pueblo”. Art. 2 de la Ley de Vigilantes de Recursos Naturales y Ambientales, 12 L.P.R.A. see. 1202. En vías de implementar dicha política pública, la Asamblea Legislativa afirmó la necesidad de establecer un cuerpo de vigilantes adscrito al DRNA para promover la “protección, supervisión, conservación, defensa y salvaguarda de los recursos naturales”. Id.
La Ley de Vigilantes de Recursos Naturales y Ambientales incluyó entre sus disposiciones la siguiente definición del término zona marítimo-terrestre:
... El espacio de las costas de Puerto Rico que baña el mar en su flujo y reflujo, en donde son sensibles las mareas, y las mayores olas en los temporales, en donde las mareas no son *443 sensibles e incluye los terrenos ganados al mar y las márgenes de los ríos, hasta el sitio en que sean navegables o se hagan sensibles las mareas; y el término sin condiciones significa la zona marítimo-terrestre de Puerto Rico, según se define en las leyes aplicables. Art. 3 de la Ley de Vigilantes de Recursos Naturales y Ambientales, 12 L.P.R.A. sec. 1203(i).
Como puede observarse, la Ley de Vigilantes reprodujo en torno a esta zona la definición que surge de la Ley de Muelles y Puertos de Puerto Rico de 1968. Una definición que tiene sus orígenes en un contexto físico, social e histórico marcadamente distinto, pero que se ha reproducido y mantenido esencialmente inalterada en piezas legislativas aún vigentes en nuestro ordenamiento.
Así, pues, el esquema estatutario vigente al momento de aprobarse el Reglamento 4860 mantenía una definición cuyos orígenes se remontan a una legislación decimonónica enfocada en la administración de la zona marítimo-terrestre conforme a los intereses comerciales y económicos de la época. No obstante, la interpretación que de esta definición se realice en la actualidad debe estar, necesariamente, enmarcada en la política pública ambiental que rige en nuestro ordenamiento, y exige la conservación y preservación de la zona marítimo-terrestre como recurso natural de gran valor ecológico, sociocultural y ambiental. El DRNA tiene el deber ineludible de ejercer las facultades que ostenta concernientes a esta zona, entre ellas su deslinde, de manera cónsona con la política pública ambiental que rige en nuestro ordenamiento. Dentro de este marco legal se promulgó el Reglamento 4860.
IV
El Artículo 1(1.2) del Reglamento 4860 señala como base legal para su adopción la obligación que le impone al DRNA la Ley Núm. 23 de implantar la política pública sobre la más eficaz conservación de nuestros recursos naturales. Asimismo, alude a los deberes y las facultades que le confiere la citada ley en tomo a la vigilancia, con *444 servación, saneamiento y deslinde de la zona marítimoterrestre. Id.
El Reglamento 4860 identifica como uno de sus objetivos principales establecer los criterios y mecanismos necesarios para cumplir las responsabilidades antes indicadas. Art. 1(1.3) del Reglamento 4860. Se resalta en la declaración de propósito de esta pieza reglamentaria que es responsabilidad del DRNA, además de delimitar la zona marítimo-terrestre, el “asegurar su integridad y adecuada conservación, adoptando, en su caso, las medidas de protección y restauración necesarias”. Art. 1(1.3)(A) del Reglamento 4860.
Ahora bien, el Reglamento 4860 puntualiza que la definición de la zona marítimo-terrestre, según configurada en la Ley de Muelles y Puertos de Puerto Rico de 1968, no responde a las necesidades contemporáneas de conservación y preservación.(11) Id. Conforme a esto, el Reglamento 4860 señala que la definición vigente responde a intereses imperantes en otro contexto histórico y social por lo cual “no satisface la realidad natural, ni exigencias contemporáneas de conservación, preservación y saneamiento ...”.(12) Art. 1(1.3) del Reglamento 4860, pág. 6.
*445 Así, pues, en la declaración de propósito de este reglamento, el DRNA afirmó la necesidad de atemperar “expresiones legales históricas con realidades naturales y científicas contemporáneas”. Art. 1(1.3) del Reglamento 4860, pág. 6. En ese tenor, el Reglamento precisó los criterios que deben ser considerados al delimitar la zona marítimoterrestre.
En primer lugar, se dispuso en el Art. 1(1.4)(B)(1) del Reglamento 4860, pág. 9, que se consideraría un bien de dominio público
[l]a ribera del mar, y de las rías, que incluye la zona marítima-terrestre, determinada mediante deslinde o delimitación certificada por el Departamento, a tenor con los criterios establecidos en los Artículos 3 ó 15. Se considerarán incluidas en esta zona aquellas marismas, manglares, pantanos y, en general, los terrenos bajos que se inundan como consecuencia del flujo y reflujo de las mareas. (Énfasis suplido.)
En iguales términos, el Artículo 2(2.17) del Reglamento 4860 indica que la zona marítimo terrestre “incluye aquellas marismas, albuferas, marjales, estuarios y, en general, los terrenos bajos que se inundan como consecuencia del flujo y reflujo de las mareas, con su lecho y subsuelo”. Po-demos observar que el Reglamento adoptó como parte de la zona marítimo-terrestre los espacios que se incorporaron expresamente a ésta en España a través de la Ley de Costas de 1988.
De otra parte, el Reglamento 4860 aclara, en el Artículo 1(1.5)(B), que se excluyen de su aplicación los terrenos de dominio particular que estén enclavados en la zona marítimo terrestre, aunque a éstos le aplican las disposiciones del Reglamento 4860 relativas a su deslinde. El Artículo 3(3.1) del Reglamento 4860, aplicable al presente caso, dis-pone que el deslinde de la zona marítimo-terrestre se realizará de oficio o a petición de parte interesada y será certificado por el Secretario del DRNA. El Artículo 3(3.2) del *446 citado reglamento, pág. 28, exige que toda petición de deslinde incluya “la información necesaria para establecer la demarcación [histórica tierra adentro] de dicha zona”.(13)
En segundo lugar, el Artículo 3(3.3) del Reglamento establece que al efectuar un deslinde, además de la información histórica requerida, el DRNA podrá tomar en consideración otros factores. Específicamente prescribe que
[e]n aquellos lugares de las costas de Puerto Rico que baña el mar en su flujo y reflujo, en donde son sensibles la mareas, se considerarán también los rasgos topográficos y geográficos del lugar, tanto históricos como actuales, incluyendo, sin limitarse, a la presencia de dunas, manglares, marismas, marjales y albuferas, rías, playas, entre otros.(14) (Enfasis suplido.)
En este inciso del Reglamento 4860 se incluye una enumeración aún más extensiva que la incluida en los incisos 1.4 y 2.17 antes citados, pues incluye, además, como elementos a considerar las dunas y las playas, entre otros. En particular, las playas se definen en el Artículo 2(2.73) del citado Reglamento, pág. 22, en términos similares que la Ley de Costas de 1969 de España, como la “ribera del mar o del océano formada de arena no consolidada, ocasional *447 mente grava o pedregales, en superficies casi planas, con pendiente suave, con o sin vegetación característica”.
Tras enunciar los factores topográficos y geográficos antes indicados, el Reglamento 4860 establece un método subsidiario para determinar los límites de la zona, en lugares en donde son sensibles las mareas, cuando no esté disponible la información histórica o actual sobre las características geográficas y topográficas antes reseñadas. En tales instancias, el Artículo 3(3.3)(B), pág. 29, dicta que el DRNA debe considerar toda la información disponible “con énfasis particular en las mareas equinocciales”.(15)
Por último, el Artículo 3(3.3) del Reglamento 4860 prescribe que en aquellos lugares en los que la marea no sea sensible, el DRNA podrá utilizar, además de la información histórica que tenga disponible, aquella información generada mediante modelaje matemático y estudios computadorizados realizados por el DRNA u otras agencias estatales o federales.
De las secciones antes citadas surgen varios criterios que evidentemente inciden sobre la definición histórica de la zona marítimo-terrestre. Ello, según afirma el DRNA, responde a la necesidad de atemperar su interpretación a las exigencias actuales de conservación y preservación.
Al adoptar el Reglamento 4860 el DRNA, primeramente, sostuvo un criterio dual para establecer los límites de la zona marítimo-terrestre. Se distingue entre los criterios para precisar los límites de la zona marítimo-terrestre “aquellos lugares de las costas de Puerto Rico que baña el mar en su flujo y reflujo, en donde son sensibles la mareas” y otros para los espacios litorales “donde las mareas no son sensibles”. Art. 3(3.3)(A), (B) y (C) del Reglamento 4860, pág. 29.
*448 Además, el citado reglamento precisó que en las costas de Puerto Rico donde las mareas son sensibles deben considerarse los rasgos topográficos y geográficos del lugar. En ausencia de información histórica o actual sobre estos rasgos, entonces, se delimitará la zona marítimo-terrestre haciendo énfasis particular en las mareas equinocciales.
Así, pues, el Reglamento 4860 no dispone que “las olas en los mayores temporales” constituye un factor a considerar al delimitar la zona marítimo-terrestre en las costas de Puerto Rico donde las mareas son sensibles. Por el contrario, reafirmó que dicho criterio aplica en aquellos espacios litorales donde las mareas no son sensibles. En consonancia con ello, el Artículo 1(1.4) del Reglamento 4860, pág. 9, señala que son parte de la zona marítimo-terrestre los acantilados que estén en contacto con el mar o con dicha zona “hasta el nivel más alto alcanzado por las olas en tormentas”.
En suma, en su interés de atemperar y esclarecer la definición de la zona marítimo-terrestre provista por la legislación vigente, el Reglamento 4860 sostuvo un criterio dual para delimitar esta zona pero, a su vez, precisó que el DRNA no debe pasar por alto las características topográficas y geográficas que refleje el espacio sobre el cual se realizará el deslinde, en aquellos lugares donde sean sensibles las mareas.
Ello nos obliga a considerar si el DRNA, al incorporar por vía de reglamentación los rasgos topográficos y geográficos enunciados, los cuales no se encuentran especificados en la legislación vigente, actuó dentro de sus facultades de reglamentar o si, por el contrario, su actuación fue ultra vires. Examinemos los principios del derecho administrativo que, en lo referente a este último aspecto, deben regir nuestra función revisora.
*449 V
A. Las agencias administrativas tienen la facultad que, en su caso, le delegue la Asamblea Legislativa para adoptar reglas de carácter legislativo cuyos efectos trasciendan a la comunidad en general.(16) Caribe Comms., Inc. v. P.R.T.Co., 157 D.P.R. 203, 211 (2002). Véanse, además: Asoc. Fcias. Com. v. Depto. de Salud, 156 D.P.R. 105, 130-132 (2002); J.P. v. Frente Unido I, 165 D.P.R. 445, 469-470 (2005). Expone el profesor Demetrio Fernández, que “[l]a acción de reglamentación de la agencia va dirigida precisamente a darle contenido y fijarle concreción a la política pública que se le ha encomendado a la agencia implantar”. D. Fernández Quiñones, Derecho administrativo y la Ley de Procedimiento Administrativo Uniforme, 2da ed. rev., Bogotá, Ed. Forum, 2001, pág. 110.
Al promulgar un reglamento, las agencias deben cumplir estrictamente con los requisitos que establece la ley para viabilizar la participación ciudadana en el proceso decisional administrativo y posibilitar así la expresión de aquellos cuyos intereses podrían verse afectados a raíz de la actuación administrativa. Asoc. Fcias. Com. v. Depto. de Salud, supra, págs. 131-132. Se requiere para la validez procesal de una norma reglamentaria que ésta se promulgue en cumplimiento con los procedimientos pautados por la ley orgánica de la agencia o por las leyes especiales. íd., pág. 130.
De otra parte, la validez de una reglamentación está sujeta, en términos sustantivos, a que: (1) se le haya delegado a la agencia el poder de reglamentar; (2) la actuación administrativa esté autorizada por ley; (3) la reglamenta *450 ción promulgada esté dentro de los amplios poderes delegados, y (4) la reglamentación no sea arbitraria o caprichosa. M. & B. S., Inc. v. Depto. de Agricultura, 118 D.P.R. 319, 326 (1987). Véanse, además: Asoc. Fcias. Com. v. Depto. de Salud, supra, pág. 130; Carrero v. Depto. de Educación, 141 D.P.R. 830, 837 (1996); Luán Investment Corp. v. Román, 125 D.P.R. 533, 550 (1990).
Según surge de los criterios esbozados, primeramente, al determinar la validez de una regla de carácter legislativo es indispensable examinar si en su adopción la agencia excedió los poderes y las facultades que se le delegaron. Para dicho análisis recurrimos a la ley habilitadora como “mecanismo legal [mediante el cual se] le delega a la agencia los poderes necesarios para actuar de conformidad con el propósito legislativo”. Amieiro González v. Pinnacle Real Estate, 173 D.P.R. 363 (2008). Véase, además, Caribe Comms., Inc. v. P.R.T.Co., supra, pág. 211.
Así, el ejercicio de nuestra función revisora requiere que precisemos si la actuación de la agencia se ajusta al poder delegado y a la política establecida por la Asamblea Legislativa. Véase Comisionado de Seguros v. PRIA, 168 D.P.R. 659, 667 (2006). En ese tenor, la reglamentación para ser válida debe estar “de acuerdo con las disposiciones estatutarias bajo las cuales se promulgó”. Carrero v. Depto. de Educación, supra, pág. 837. Véanse, además: P.S.P. v. Com. Estatal de Elecciones, 110 D.P.R. 400, 409 (1980); Asoc. Fcias. Com. v. Depto. de Salud, supra.
Como un último criterio para determinar la validez sustantiva de una norma reglamentaria, debe considerarse si ésta adolece de arbitrariedad o irracionabilidad. Franco v. Depto. de Educación, 148 D.P.R. 703, 712 (1999). Véase, además, Carrero v. Depto. de Educación, supra, págs. 837-838. Hemos reiterado que se considera inválida una regla que merezca la calificación de arbitraria o caprichosa por carecer de conexión racional con el estatuto que autoriza su creación. Carrero, supra.
*451 Así, pues, el ejercicio de reglamentar presupone la previa consideración e interpretación por parte del organismo administrativo del estatuto o la política pública cuya implementación le ha sido encomendada. La irracionabilidad o arbitrariedad como elementos para dilucidar la validez sustantiva de una norma reglamentaria implican cierta deferencia a la construcción normativa que, mediante reglamentación, el organismo administrativo realice en tomo a la legislación cuya implementación le corresponde.(17) Ello descansa en la noción de que las agencias administrativas, dada la especialidad que se les atribuye, están en posición de adoptar reglas que se ajusten adecuadamente a la política pública o a la ley que se les ha encomendado aplicar.
B. Expuestos los requisitos para la validez sustantiva de una regla legislativa, recalcamos que una vez un organismo administrativo adopta una norma reglamentaria está obligado a observarla estrictamente, pues la misma opera como límite a su discreción. Com. Vec. Pro-Mej., Inc. v. J.P., 147 D.P.R. 750, 764-765 (1999). Véanse, además: García Cabán v. U.P.R., 120 D.P.R. 167, 175 (1987); T-JAC, Inc. v. Caguas Centrum Limited, 148 D.P.R. 70, 81 (1999). En ese tenor, hemos sido enfáticos en que una vez una agencia promulga una norma reglamentaria “debe cumplirla y aplicarla en la manera en que está concebida, sirviendo siempre a los propósitos, los objetivos y la política pública que la forjaron”. T-JAC, Inc. v. Caguas Centrum Limited, supra, pág. 81.
Como norma general, las agencias administrativas in *452 terpretan y aplican, en primera instancia, las leyes y los reglamentos cuya administración les corresponde. Com. Vec. Pro-Mej., Inc. v. J.P., supra, pág. 761. En el ejercicio de dichas funciones los organismos administrativos están en mejor posición de “armonizar los propósitos [de la legislación] con las situaciones de día a día”. Id.
No obstante lo anterior, las agencias “no puede [n] simplemente eliminar sus reglamentos y reinstalarlos, sin el beneficio del proceso de reglamentación, a través de reglas interpretativas” o amparándose en el conocimiento especializado que se le atribuye.(18) Asoc. Fcias. Com. v. Depto. de Salud, supra, págs. 148-149. Ello lesionaría la garantía de una participación adecuada por parte de aquellos cuyos intereses se verían afectados por la norma que se pretende implantar eludiendo el proceso de reglamentación. Sobre este aspecto, en López Leyro v. E.L.A., 173 D.P.R. 15 (2008), expusimos lo siguiente:
[L]os reglamentos [administrativos] crean un estado de Derecho que protege a quienes actúan bajo sus disposiciones. Las agencias administrativas, por lo tanto, no pueden ignorar sus propias reglas y fundamentar sus actos en una autoridad interpretativa superior debido a su particular experiencia. Por esto, las interpretaciones que las agencias realicen de sus propios reglamentos se deben amparar en la razón y en la afinidad con sus leyes habilitadoras. (Citas omitidas.)
Permitir que las agencias actúen al margen de los reglamentos que promulgan, alterando sus disposiciones bajo el pretexto de reglas interpretativas o al amparo de la experiencia que se les atribuye, sería dotar a los organismos administrativos de una discreción ilimitada, lo cual ba sido rechazado firmemente por este Tribunal. Asoc. Fcias. Com. v. Depto. de Salud, supra.
*453 VI
De acuerdo con la discusión que antecede, debemos determinar si actuó correctamente el Tribunal de Apelaciones al revocar la orden mediante la cual el Tribunal de Primera Instancia ordenó que el Secretario del DRNA certificara el deslinde de la zona marítimo-terrestre utilizando, únicamente, como base para ello unos estudios de marejadas. A su vez, debemos evaluar si se sostiene la posición del DRNA, avalada por el foro apelativo intermedio, de que procede considerar en conjunto los criterios de “las mareas en su flujo y reflujo” y “las mayores olas en los temporales” para establecer los límites de la zona marítimo-terrestre. De otra parte, nos corresponde resolver si el DRNA puede recurrir a los rasgos topográficos y geográficos enunciados en el Reglamento 4860 para establecer los lindes de dicha zona a pesar de que éstos no se incluyen expresamente en la definición legislativa vigente. Recordemos que la sentencia recurrida también sostuvo la posición del DRNA en cuanto a este último aspecto.
Enfatizamos que la presente controversia se centra en el alcance de una definición que se incorporó en la legislación española del siglo 19 con el propósito de salvaguardar los intereses imperantes en dicho contexto social e histórico. La definición de la zona marítimo-terrestre ha sido ampliamente abordada por la doctrina española desde una perspectiva histórica con el propósito de dilucidar el alcance de sus distintos componentes. Así, la doctrina acude a la intención del legislador español del siglo 19 con la aspiración de esclarecer de manera afín a la misma los distintos conflictos que se suscitaban en torno a esta zona del litoral costero.
No obstante, no debemos circunscribirnos a un análisis relativo a la génesis de la definición de la zona marítimoterrestre bajo el fundamento de que ésta se mantiene en nuestro ordenamiento según se configuró en la legislación *454 decimonónica. Limitar nuestro análisis a dicha dimensión textual e histórica tendría el efecto impermisible de soslayar la política pública ambiental actual establecida por la Constitución de Puerto Rico y firmemente reiterada por la Asamblea Legislativa.
No podemos resolver esta controversia a espaldas de la política pública ambiental dispuesta en la Constitución de Puerto Rico cuando esta Alta Curia ha reiterado que su expresión constituye un mandato para todos los componentes del Estado. Tampoco podemos resolver la controversia que nos ocupa ignorando que la Asamblea Legislativa ha reafirmado con vigor la necesidad “crítica” de la más eficaz conservación de nuestros recursos naturales, imponiéndole a las agencias del Estado el deber de implementar, administrar e interpretar sus leyes y reglamentos de forma que se asegure el cumplimiento con esa política pública.
El Reglamento 4860 constituye, precisamente, el esfuerzo del DRNA de ejercer los deberes que le impone su ley orgánica cumpliendo, a su vez, con su función de implementar la política pública ambiental. Coincidimos con el DRNA en que el alcance que le atribuya dicha agencia a la definición de la zona marítimo-terrestre debe, necesariamente, atemperarse a las necesidades de conservación y preservación de la misma, pues de lo contrario su actuación contravendría la política pública cuya implementación le encomendó la Asamblea Legislativa.
Ahora bien, la construcción normativa que el DRNA realizó a través de su facultad para reglamentar no puede exceder el ámbito del poder que le ha sido delegado. Examinemos si las disposiciones aplicables del Reglamento 4860 son sostenibles según el poder para reglamentar delegado mediante la Ley Núm. 23.
Un análisis de las secciones pertinentes del Reglamento 4860 demuestra que a través de éste el DRNA sostuvo, sin duda alguna, un criterio dual para establecer los límites de *455 la zona marítimo-terrestre. El Reglamento distingue entre los factores que deben ser considerados en los deslindes que se realicen en los espacios costeros donde son sensibles las mareas y aquellos aplicables donde no lo sean. En cuanto a este aspecto, el DRNA reprodujo textualmente la distinción contemplada en la definición de la zona marítimo-terrestre vigente en la legislación. Por consiguiente, no podemos afirmar que tal proceder constituyó una actuación ultra vires por parte de este organismo administrativo.
El DRNA no puede descansar en reglas interpretativas ni en el conocimiento especializado que se le atribuye para adelantar una posición que claramente contravendría lo dispuesto en el Reglamento 4860. En ese sentido, el DRNA no puede descansar en el Manual de Procedimientos para el Deslinde del Límite Interior Tierra Adentro de los Bienes de Dominio Público Marítimo-Terrestre para sostener su posición de aplicar conjuntamente el criterio de “las mayores olas en los temporales” en lugares donde son sensibles las mareas. Ello contravendría lo prescrito en el Reglamento 4860, el cual opera como límite a la discreción de la agencia.
De otra parte, el Reglamento 4860 dispone que al realizar el deslinde de la zona marítimo-terrestre, en aquellas costas de Puerto Rico donde son sensibles las mareas, debe tomarse en consideración la información histórica y actual sobre los rasgos topográficos y geográficos del espacio en el cual se lleva a cabo el deslinde. En ausencia de esta información se delimitará la zona en función de las mareas equinocciales.
Al considerar las definiciones que el Reglamento 4860 provee para los rasgos topográficos y geográficos que deben considerarse al deslindar la zona marítimo-terrestre, identificamos que comparten el elemento de que son formaciones naturales que dependen de la acción directa, aunque no ininterrumpida, de la marea o el agua del mar. El ele *456 mentó común entre los espacios enumerados es que éstos —con excepción de las playas y las dimas— calificarían como “terrenos bajos que se inundan” por acción directa de la marea o del agua del mar. Por su parte, las playas y las dunas constituyen otros factores tan estrechamente vinculados a la zona marítimo-terrestre que deben ser considerados al momento de determinar sus límites. Así lo estableció el DRNA, ejerciendo su conocimiento especializado, al aprobar el Reglamento 4860.
Recordemos que el elemento rector al adoptar esta reglamentación fue el interés de atemperar la definición de la zona marítimo-terrestre a los adelantos científicos, la política pública ambiental y las necesidades actuales de conservación y preservación de la zona marítimo-terrestre. El DRNA estimó, amparándose en su conocimiento especializado y en el desarrollo del conocimiento científico, que la inclusión de los factores antes mencionados resulta indispensable para la conservación e integridad misma de la zona. Así lo señaló el Tribunal de Apelaciones en la sentencia recurrida al sostener que el Reglamento 4860 se adoptó al amparo del avance en las ciencias y en la tecnología, según el criterio experto de la agencia. .
Concluimos que la inclusión de dichos factores constituyó un ejercicio válido del DRNA de la facultad de reglamentar que le delegó la Asamblea Legislativa mediante la Ley Núm. 23. (19) Sostenemos que el DRNA, al adoptar dicha reglamentación, actuó dentro del marco de la política *457 legislativa expresada en su ley orgánica. Además, afirmamos que la reglamentación examinada no es arbitraria o caprichosa, pues no descansa en propósitos desvinculados de la política pública y legislativa sobre la conservación y preservación de los recursos naturales que viene llamado a poner en vigor el DRNA de acuerdo con la Ley Núm. 23. Más bien, el DRNA ejerció su facultad de reglamentar en función de las necesidades imperantes de conservación y preservación de la zona marítimo-terrestre como un recurso natural de gran valor ecológico según lo requiere su ley orgánica.
Si bien sostenemos la validez sustantiva de la norma reglamentaria que establece la consideración de factores topográficos y geográficos para delimitar la zona marítimoterrestre, para asegurar su integridad y conservación advertimos que el DRNA no puede incurrir en arbitrariedad o irracionabilidad en la aplicación de los mismos.
Al aplicar lo expuesto al presente caso, resolvemos que el DRNA no puede utilizar simultáneamente los criterios de “el mar en su flujo y reflujo” y “las mayores olas en los temporales” al delimitar la zona marítimo-terrestre en los terrenos del peticionario, pues ello implicaría ir en contra de su propia reglamentación. Más bien, le corresponde al DRNA determinar si los terrenos del señor Buono Correa son sensibles a las mareas, en cuyo caso deberá utilizar los criterios pautados para dichos casos y no recurrir al criterio de las mayores olas en los temporales. Este último criterio se reserva para las costas de Puerto Rico donde las mareas no son sensibles.
Nos resta dilucidar el planteamiento del peticionario en lo referente a si los manglares pueden considerarse parte de la zona marítimo-terrestre. El Artículo 2(2.57) del Reglamento 4860 define los manglares como formaciones vegetales capaces de “colonizar terrenos anegados sujetos a intrusiones de agua salada”. Sostenemos que de una inter *458 pretación conjunta de este inciso y los incisos 1.4, 2.17 y 3.3 del Reglamento 4860 surge que los manglares se considerarán parte integral de la zona marítimo-terrestre en tanto se inunden como consecuencia de la acción del oleaje o del agua del mar. Así lo sostuvo el Tribunal de Apelaciones al interpretar que la definición de manglares prescrita en el Reglamento 4860 sugiere la existencia “de una vinculación directa del área de mangle con el oleaje marino”. Coincidimos con lo anterior y reafirmamos que en tanto el DRNA determine que los manglares de los terrenos del señor Buono Correa están sujetos a la acción directa —aunque no ininterrumpida— del oleaje o del agua del mar, deben considerarse parte integral de la zona marítimoterrestre.
Tras determinar la validez sustantiva de los factores establecidos en el Reglamento 4860, concluimos que erró el Tribunal de Primera Instancia al ordenar que el DRNA certificara el deslinde de la zona marítimo-terrestre considerando únicamente los estudios de marejadas. El DRNA debe considerar los rasgos topográficos y geográficos de los terrenos del peticionario para realizar el deslinde de la referida zona.
De otra parte, sostenemos que no incidió el foro primario al disponer que el DRNA no debe utilizar de forma con-junta los criterios del “mar en su flujo y reflujo” y “las mayores olas en los temporales”. El DRNA debe aplicar dichos criterios en estricta conformidad con lo dispuesto en el Reglamento 4860.
En suma, sostenemos que al adoptar el Reglamento 4860 el DRNA actuó cumpliendo con el deber que le impone la exigencia de la más eficaz conservación de la zona marítimo-terrestre como un recurso natural de trascendental valor ecológico, estético y cultural. Consecuentemente, el DRNA debe llevar a cabo el deslinde de esta zona en estricta conformidad con el Reglamento 4860.
*459 VII
En virtud de los pronunciamientos que anteceden, confirmamos la sentencia recurrida en tanto ésta revocó la or-den mediante la cual el Tribunal de Primera Instancia ordenó al Secretario del DRNA certificar el deslinde sólo en función del estudio de marejadas sometido por el peticionario. Modificamos la determinación del foro apelativo para aclarar que el DRNA debe realizar el deslinde de la zona marítimo-terrestre en estricta conformidad con el Reglamento 4860, por lo que no procede que utilice conjuntamente los criterios del “mar en su flujo y reflujo” y “las mayores olas en los temporales”. Devolvemos el caso al Tribunal de Primera Instancia para trámites posteriores compatibles con lo aquí resuelto.

Se dictará sentencia de conformidad.

La Jueza Asociada Señora Fiol Matta emitió una opinión concurrente y disidente. El Juez Asociado Señor Rivera Pérez concurrió con el resultado sin opinión escrita. La Jueza Asociada Señora Pabón Chambeo no interviene.

 El peticionario aduce que erró el Tribunal de Apelaciones al permitir esta enmienda. En el recurso de certiorari presentado ante el foro apelativo intermedio se identificó en el epígrafe como demandado y peticionario al Secretario del Departamento de Recursos Naturales y Ambientales (Secretario del DRNA) y en la comparecencia se señaló al DRNA como la parte peticionaria. Sostenemos que esta incongruencia constituyó un error o una inadvertencia excusable en las formalidades del recurso que no privó al Tribunal de Apelaciones de su jurisdicción. Véase Regla 34 del Reglamento del Tribunal de Apelaciones, 4 L.P.R.A. Ap. XXII-A. Éste, claramente, no abusó de su discreción al permitir la enmienda para incluir en la comparecencia del recurso al Secretario del DRNA.

 Horgué Baena fundamenta su posición en que la delimitación de las playas adoptada en la Ley de Aguas de 1866 responde al proyecto elaborado por Cirilo Franquet para el 1859, el cual sirvió de antecedente a dicha ley y “expresamente conectaba las mareas al Atlántico y refería los temporales al Mediterráneo, donde las mareas son apenas sensibles C. Horgué Baena, El deslinde de costas, Madrid, Ed. Tecnos, 1995, pág. 31. El proyecto de Franquet, en su artículo 10, conceptuaba la playa como “ ‘todo el espacio que bañan las pleamares en el Océano y las mayores olas durante las tempestades en el Mediterráneo’ ”. Id., citando a Proyecto de un Código General de Aguas, Madrid, Imprenta Nacional, 1859, pág. 11.

 En Puerto Rico se mantuvo vigente la Ley de Aguas de 1866 hasta 1886 cuando fue sustituida por la Ley de Aguas de 13 de junio de 1879 y la Ley de Puertos de 1880.

 Algunas de esas modificaciones se incorporaron para ampliar la categoría de los bienes considerados de dominio público, mientras que otras para dejar establecido con mayor claridad “la posible existencia de enclaves privados en la costa”. E. Desdentado Daroca, La expropiación de los enclaves privados en la zona costera, Navarra, Ed. Thomson Civitas, 2007, pág. 26.

 La profesora Horgué Baena, op. cit, pág. 35, señala que debido a que el concepto playa y el de zona marítimo-terrestre se refieren a un mismo espacio, se mantuvo bajo esta última el criterio alternativo del mar en su flujo y reflujo en la costa del Atlántico y las olas en los temporales en las costas del Mediterráneo. Si ambos conceptos, en efecto, son equivalentes, se sostendría con igual vigor la postura doctrinal que sugiere que simplemente se reafirmó el criterio unitario de lo que se consideraba “ribera del mar” o las “orillas del mar” de las Partidas y del derecho romano.

 De acuerdo con las Reales Órdenes de 24 de febrero de 1838 y de 1 de marzo de 1839 se podían calificar los montes como bienes “de dominio particular ... comunes, propios de los pueblos y de establecimientos públicos ..., y montes baldíos y realengos ... propiedad del Estado, y cuya administración corresponde, por tanto, al Gobierno”. Q.M. Scaevola, Código Civil, Madrid, 1891, T. VI, pág. 144.

 El Capítulo X del Título Tercero de la Ley de Aguas de 1866 indicaba que podían desecarse las lagunas o terrenos pantanosos a discreción de sus dueños. Art. 100 de la Ley de Aguas de 1866, Colección Legislativa de España, Madrid, T. XCVI, pág. 312. De otra parte, se establecía que en caso de que los terrenos fuesen declarados insalubres, procedería forzosamente su desecación. Art. 104 de la Ley de Aguas de 1866, supra, pág. 313.

 Surge de la Exposición de Motivos de esa ley su objetivo de mantener bajo el dominio público “los espacios naturales que reúnan las características del medio, [y] además establecer los mecanismos que favorezcan la incorporación de terrenos al dominio público, ampliando la estrecha franja costera que actualmente tiene esta calificación demanial”. Horgué Baena, op. cit., pág. 57.

 Igual definición la encontramos en el Reglamento de Zonifieaeión de 2000 promulgado por la Junta de Planificación, y el Reglamento de Zonifieaeión de la Zona Costanera y de Acceso a Playas y Costas de Puerto Rico de 1983, también promulgado por la Junta de Planificación.

 La Ley Núm. 9 fue sustituida por la Ley Núm. 416 de 22 de septiembre de 2004 (12 L.P.R.A. see. 8001 et seq.). No obstante, al momento de adoptarse el Reglamento 4860 estaba vigente la Ley Núm. 9. La Ley Núm. 416 mantuvo, esencialmente, las disposiciones de la Ley Núm. 9 a las cuales hacemos referencia.

 El Reglamento 4860 sostiene dicha definición al disponer en su Artículo 2(2.108) qué constituye la zona marítimo-terrestre:
"... el espacio de las costas del Estado Libre Asociado de Puerto Rico que baña el mar en su flujo y reflujo, en donde son sensibles las mareas, y las mayores olas en los temporales, en donde las mareas no son sensibles, e incluye los terrenos ganados al mar, las accesiones y aterramientos que ocasiona el mismo y los márgenes de los ríos hasta el sitio en que sean navegables o se hagan sensibles las mareas. El término, sin condicionar, significa la zona marítimo-terrestre de Puerto Rico.”

 En el Artículo 2 del Reglamento 4860 se definen estos términos de la siguiente manera: (1) “Conservación—concepto de planificación y manejo que implica la guarda, protección, defensa, control y utilización limitada de un sector considerado como un recurso natural, cultural o ecológico, con el propósito de mejorar y mantener sus condiciones y características naturales” (Art. 2(2.21), pág. 16); (2) “Preservación—concepto de planificación que implica el cuidado y protección de un sector designado como un recurso natural, cultural o ecológico único o importante, con el propósito de mantener su condición y características únicas y especiales, con el fin ulterior de estudiarlo y contemplarlo en forma restringida, limitada y controlada” (Art. 2(2.75), pág. 23); (3) “Saneamiento—conjunto de acciones dirigidas a mejorar las condiciones existentes en un lugar y encaminadas a eliminar aquellas que afectan adversamente los recursos existentes en el mismo” (Art. 2(2.91), pág. 24).

 El citado Art. 3(3.2) precisa que en aquellas áreas en que exista evidencia de que las playas, riberas y orillas del mar se han alterado mediante acción humana, el DRNA debe presumir “que el límite histórico tierra adentro de la zona marítimo— terrestre es aquel más distante tierra adentro que pueda determinarse haciendo referencia a estudios topográficos e hidrográficos, planos de autorizaciones, concesiones, licencias, franquicias o permisos anteriores, mapas, o cartas de mareas o navegación”.

 El Artículo 2 del Reglamento 4860 provee las siguientes definiciones: (1) “Duna—promontorio de arena fina, con o sin vegetación, transportada en las playas por la acción del viento” (Art. 2(2.37), pág. 19); (2) “Manglares—formación vegetal propia de las zonas litorales tropicales compuesta por especies de árboles que generalmente poseen órganos accesorios de respiración que les permiten colonizar terrenos anegados sujetos a intrusiones de agua salada” (Art. 2(2.57), pág. 21); (3) “Marisma—terreno bajo y pantanoso que se inunda con las aguas del mar” (Art. 2(2.61), pág. 21); (4) “Marjales—terrenos pantanosos” (Art. 2(2.62), pág. 21); (5) “Albufera— laguna formada por las crecientes del mar” (Art. 2(2.6), pág. 13); (6) “Rías—entrante marítimo debido a la anegación, por parte de las aguas marinas, de la zona baja de algunos valles fluviales. Ensenada amplia” (Art. 2(2.86), pág. 24).

 Se definen las Mareas Equinocciales como el “flujo y reflujo del mar que baña las riberas durante la época del año en la primavera y en el otoño en que el sol, pasando por el Ecuador dá a la noche igual duración que al día”. Art. 2(2.59) del Reglamento 4860, pág. 21.

 En el derecho administrativo, “ ‘[u]na regla legislativa es aquella que crea derechos, impone obligaciones y establece un patrón de conducta que tiene fuerza de ley ”. Asoc. Fcias. Com. v. Depto. de Salud, 156 D.P.R. 105, 146 (2002), citando a Mun. de San Juan v. J.C.A., 152 D.P.R. 673, 692 (2000).

 Sobre este particular, el profesor Frank Cross señala que desde una perspectiva pragmática se justifica la deferencia a los organismos administrativos bajo la premisa de que éstos: “ ‘may adjust their interpretations to new facts, policies, and even political values.’ A deference doctrine thus represents a pragmatic recognition of the ability of agencies to discern the statutory interpretation most in the public interest.” F. Cross, The Theory and Practice of Statutory Interpretation, California, Stanford University Press, 2009, pág. 111.

 Las reglas interpretativas no pueden estar reñidas con normas establecidas mediante el proceso de reglamentación. Asoc. Fcias. Com. v. Depto. de Salud, supra, pág. 146. Una regla interpretativa no tiene fuerza de ley, pues se limita a “clarificar o dar uniformidad a procedimientos internos” de la agencia. Id.

 Es preciso puntualizar que el Art. 3(3.3) del Reglamento 4860 no incluye una enumeración taxativa de los factores topográficos y geográficos que puede considerar el DRNA al realizar el deslinde de la zona marítimo-terrestre. En esta ocasión nos limitamos a examinar si es válida la consideración de los factores expresamente incluidos en se inciso (3.3). Queda para una ocasión futura el examen sobre la validez de otros factores que, en circunstancias particulares, el DRNA determine necesario considerar al establecer los límites de la zona marítimo-terrestre. La validez de cualquier otro factor dependerá de que el DRNA no exceda el ámbito de los poderes que le han sido delegados y de que su aplicación no adolezca de arbitrariedad o irracionabilidad. Mediante su facultad para reglamentar el DRNA no puede arribar a resultadosinsostenibles bajo la normativa antes expuesta.